**THE MILDRED COTLER TRUST, John W. Hughes and Shirley Mellon, Trustees, the Shirley Mellon Trust, John W. Hughes and Shirley Mellon, Trustees, the Justine Chelsea Brandy Trust, John W. Hughes and Shirley Mellon, Trustees, and Estate of Mildred Cotler, Shirley Mellon, Executrix, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 93–CV–5106 (JG).

United States District Court,
E.D. New York.

March 12, 1998.

Zachary W. Carter, United States Attorney, Eastern District of New York by John V. Cardone, Trial Attorney, Tax Division, Washington, DC, for Defendant.

John W. Hughes, New York City, for Plaintiffs.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

In October 1984, the Internal Revenue Service ("IRS") mistakenly sent Mildred Cotler two refund checks totaling $172,717.94. In 1990, three years after Mildred Cotler died, the IRS filed a claim in state court against the Estate of Mildred Cotler ("the Estate") for return of the mistaken payments. The Estate paid the claim, then filed the instant action against the government to recover what it considers an "illegally collected" payment.

Before trial, the plaintiffs moved for summary judgment. I denied that motion on March 31, 1997. On May 22, 1997, a trial was held to resolve the single issue of disputed fact. The following constitute my findings of fact and conclusions of law. Because I believe the plaintiffs are not entitled to the money the IRS erroneously refunded to Mildred Cotler, the Clerk of the Court is respectfully directed to enter judgment for the defendant.

## FINDINGS OF FACT

### A. *The Undisputed Facts*

The pertinent facts are largely undisputed. Irving and Mildred Cotler ("the Cotlers") filed joint income tax returns for the taxable years 1972 through 1979. In March 1982, the IRS commenced an audit of the Cotlers' returns for those years. The following month, the IRS sent the Cotlers a form showing proposed adjustments to their liability. The proposed adjustments were based on the IRS's finding that Irving Cotler had failed to report income for the taxable years 1972 through 1979. Specifically, the Cotlers had not reported income from illegal payments he took from corrupt union officials. Irving Cotler was indicted and ultimately convicted for violating labor racketeering statutes.

The IRS's April 1982 proposed adjustment form indicated that the Cotlers owed $107,570 in taxes. In June 1982, the Cotlers made an advance payment of that amount to the IRS. In January 1983, the IRS sent the Cotlers an "Examination Report" proposing a liability of $150,526 (which reflected $99,006 in underpayment of taxes and $51,520 in penalties). Shortly after receiving the report, Irving Cotler requested an appeal of the findings.

In October 1983, Irving Cotler died. In December 1983, the IRS sent a Statutory Notice of Deficiency to the Estate of Irving Cotler and Mildred Cotler, Surviving Wife, indicating amounts due of $99,022 in tax liability, and $51,527 in penalties.[1] In May 1984, pursuant to an agreement between Mildred Cotler and the IRS, a decision was entered by the Tax Court determining the amount of tax owed by Cotler[2] as follows: $99,022 in tax liability and $25,764 in penalties. (Interest was not included). In June

1984, Cotler paid $25,764 to the IRS to cover the penalty portion of the assessment. As noted above, the Cotlers had in June 1982 prepaid $107,570.

On September 4, 1984, the IRS formally assessed the Cotlers' liability as agreed in the settlement. The assessment was for $99,022 in liability plus $43,186.71 in interest. However, this assessment was not immediately "posted" in the IRS computer until the week beginning October 21, 1984; *i.e.,* the IRS computer records did not reflect the assessment until seven weeks after it was made. So long as this assessment was not posted, the Cotlers' IRS account showed a substantial credit in the form of the payments in 1982 and 1984 totaling approximately $133,334, not including interest.

On October 1, 1984—before the liability was posted—the "hold code" which had been placed on the Cotlers' IRS account during settlement negotiations with the IRS was removed. A hold code holds all credits in a taxpayer's account. Once the hold code was removed, the IRS paid out the amount shown as a credit in the Cotlers' account. The payments, totaling $172,717.94, were made in checks sent to Mildred Cotler on October 1 and October 15, 1984. Cotler cashed the checks.

Thus, by the time the assessment was finally posted to Cotlers' account during the week of October 21, 1984, the money which had been pre-paid by the Cotlers had already been refunded to Mildred Cotler. Since the pre-paid money was gone, as soon as the assessment was posted, the account reflected a deficit equal to the amount of the assessment. On November 16, 1984, the IRS sent a Final Notice to Mildred Cotler requesting payment of $157,676.23 in tax liability.[3] Cot-

---

1. The slight differences in amount—$16 for the underpayment portion and $7 for the penalty portion—are unexplained.

2. The agreement was in fact between the IRS and Mildred Cotler as surviving wife, Mildred Cotler as executrix of her husband's estate, and her husband's estate itself. For simplification purposes, I will refer to Mildred Cotler to mean both her and her husband's estate (unless otherwise noted). References to her tax liability

therefore are intended to refer to both her personal tax liability and that of her husband's estate.

3. On November 9, 1984, the Cotlers had made an interest payment of $34,639.00 pursuant to the September 4 assessment. It is not entirely clear whether the Final Notice issued by the IRS reflected this payment.

ler apparently did not respond to this notice.[4] On April 3, 1985, the IRS informed Mildred Cotler, through her attorney, that it erroneously had refunded the pre-payments in October 1984.

For the next several years, the IRS apparently took no action to recover the money it had erroneously paid Cotler. For her part, Mildred Cotler—who indisputably was aware that the refund was an error and had been so notified in writing in April 1985—kept the money and initiated no further correspondence with the IRS regarding the $172,717.94 she mistakenly had received.

Mildred Cotler died in August 1987. On July 2, 1990, the IRS filed a Proof of Claims against her estate in the Surrogate's Court for New York County. The Proof of Claims demanded payment of taxes, penalties and interest totaling $229,314.57. In November 1991, the estate paid the amount in full and filed this action for return of the money.

B. *The Disputed Fact*

The only material factual dispute in this case involved the cause of the erroneous refunds. The government asserted that the refunds resulted from a computer error. Specifically, the government contended that the refund was generated because the IRS failed to enter into its computer a "hold code" that would have held all credits in the Cotlers' account until the newly agreed-upon assessment was posted to the account. The failure to enter the "hold code" led the computer to mistakenly conclude that the account had a substantial credit. Ever vigilant at returning money, the IRS computer quickly generated a refund check before the new assessment—which reflected Cotler's actual liability—was posted to the account. The government thus contends that the erroneous refunds were due to computer error, and did not result from a redetermination of the Cotler's tax liability.

The plaintiffs, for their part, asserted that "the evidence presented is perfectly consis-

tent with the Government determining, albeit in error, that the tax owed was less than the tax paid." Pls.' Proposed Findings of Fact and Conclusions of Law at 8. In other words, the plaintiffs suggested that it is possible that the refunds resulted from a redetermination of Cotler's liability, not computer error.

Having tried the issue, I find that the refunds were made because someone at the IRS accidentally failed to enter a hold code on the Cotlers' account in October 1984. I credit in its entirety the testimony of the sole witness at trial. Holly Pendrell, an official at the IRS. The erroneous refund resulted because the computer mistakenly concluded that the Cotlers had a substantial credit in their account. The refund was in no way the result of a redetermination of Mildred Cotler's liability.

### CONCLUSIONS OF LAW

The convoluted series of events in this case obscures the relative straightforwardness of the relevant facts: In 1984, due to a computer error, the IRS accidentally paid Mildred Cotler and her husband's estate about $170,000. Mrs. Cotler knew immediately that the payments were mistaken. Although the IRS formally notified Cotler of the error a few months later, it did not pursue formal collection procedures until 1990—almost six years after the erroneous refunds. Despite her awareness of the obvious error and the formal written notice of her error, Mrs. Cotler kept the money.

The legal question presented is what kind of collection procedures the IRS can use to get the money back. The plaintiffs argue that it must use collection procedures which are governed by a two-year statute of limitations or must conduct a new assessment of the taxpayer's liability. The government maintains that the agency has up to ten years to collect money accidentally refunded in cases like this.

---

**4.** The Cotlers (*i.e.*, Mildred Cotler and the estate of her husband) did not cease all contact with the IRS. On November 6, 1984, the IRS had sent the Cotlers a notice requesting payment of the penalty portion of the assessment. The Cotlers replied

with a letter dated December 27, 1984 indicating that they had paid the penalty portion of the assessment, and enclosed a copy of a letter received from the IRS, dated June 22, 1984, confirming receipt of the check.

## A. Statutory Background

### 1. The Assessment of Tax Liability

Section 6201 of the Internal Revenue Code ("the Code" or "the Tax Code") authorizes and requires the IRS to make inquiries, determinations, and assessments of taxes imposed under the Code. 26 U.S.C. § 6201(a). The IRS generally is allowed three years from the date a return is filed to assess the tax. 26 U.S.C. § 6501. However, in the case of a false or fraudulent return, the tax may be assessed, or the IRS may begin collection proceedings in court, at any time. 26 U.S.C. § 6501(c)(1). The parties agree that the IRS properly and timely assessed the Cotlers' initial tax liability. In the ordinary case, the IRS had six years following an assessment to collect any taxes owed. 26 U.S.C. § 6502(a) (1989).[5]

### 2. The Collection of Erroneous Refunds

Section 7405 provides that "any portion of a tax ... which has been erroneously refunded ... may be recovered by civil action brought in the name of the United States." 26 U.S.C. § 7405. The legislative history of this section provides in addition that "obviously, if the limitations period on the making of the assessments has not expired, the erroneous refund may be recovered by assessment in the ordinary manner." S.Rep. No. 960, 70th Cong., 1st Sess. 42 (1928). This statute allows for two ways to collect an erroneous refund:

(1) a civil action pursuant to § 7405, which is subject to a two-year statute of limitations (26 U.S.C. § 6532(b)); or

(2) an assessment, pursuant to § 6201 (or the supplemental assessment provision, § 6204), followed by collection as provided in § 6502, which is subject to a six (now ten) year statute of limitations.

### 3. Rebate Refunds and Non–Rebate Refunds

■ The Tax Code contemplates two different categories of refund: "rebate refunds" and "non-rebate refunds." *O'Bryant v. United States,* 49 F.3d 340, 342 (7th Cir. 1995). A rebate refund occurs when the

Government makes a determination that the taxpayer is owed a refund because the actual tax liability is less than the taxes collected. *See* 26 U.S.C. § 6211(b)(2) (defining rebate). A non-rebate refund, on the other hand, results from an act other than a determination that the actual tax liability is less than the tax collected, such as a clerical mistake. The key distinction between a rebate refund and a non-rebate refund is whether the refund was based on a redetermination (*i.e.,* recalculation) of liability. Where the refund is pursuant to a recalculation of liability, it is a rebate refund. Where the refund is based on no such recalculation, but results merely from clerical error or other mistake, it is a non-rebate refund.

■ Having found that the rebates in this case resulted from computer error, I conclude that they were non-rebate refunds.

## B. The Disputed Legal Issue

There is substantial agreement as to the application of the law in this case. Both sides agree that the IRS's initial assessment following the audit of the Cotlers' taxes was timely. The plaintiffs do not dispute the substance of that assessment. Indeed, because the assessment was the product of a settlement agreement, they could not. The plaintiffs further concede that the statute of limitations on the assessment would not have expired until September 1990, several months after the government initiated collection procedures. The parties also agree that the Tax Code establishes two categories of refunds—rebate refunds and non-rebate refunds.

The parties further agree that the Code provides two basic methods for collection of erroneous refunds. These methods, outlined above, bear repeating:

(1) the government may commence a civil action pursuant to § 7405 of the Code, which is subject to a two-year statute of limitations (26 U.S.C. § 6532(b)); or

(2) where the time for assessment has not expired, the government may recover an

---

**5.** Section 6502 was amended in 1990 to extend the time period to ten years.

erroneous refund by collection following "assessment in the ordinary manner."

The first method of collection is not at issue in this case. The fighting ground in this case is what constitutes an appropriate assessment upon which to base collection following "assessment in the ordinary manner." The government rests its argument on the distinction between rebate and non-rebate refunds. It concedes that in the case of a rebate refund, it may not base collection on an initial assessment which pre-dated the refund. It argues, however, that in a case involving a non-rebate refund, the initial assessment may serve as a proper basis for collection. In this case, according to the government's theory, it is entitled to pursue collection on the basis of the September 1984 assessment, which was not posted in the IRS computer until after the refunds were made.

The plaintiffs disagree. They concede the distinction between rebate and non-rebate refunds, but argue that no matter what caused the refund, any payment of a tax liability "extinguishes" the assessment upon which that liability is based, to the extent of the payment. Once extinguished, the government may not thereafter base collection following "assessment in the ordinary manner" on that original assessment because it is gone—"extinguished."

## C. *The Practical Difference Between Rebate and Non–Rebate Refunds*

The parties agree that the initial assessment may not serve as the basis for collection of a rebate refund. The government contends, however, that the initial assessment may serve as the basis for collection of a non-rebate refund. The question, therefore, is whether the distinction between rebate and non-rebate refunds justifies the conclusion that § 7405 is intended to provide for different collection procedures for the different types of refunds.

The key distinction between rebate and non-rebate refunds, as noted above, is that rebate refunds are based on a recalculation of a taxpayer's liability, whereas non-rebate refunds are not based on any such recalcula-

tion. There are two practical distinctions between rebate and non-rebate refunds. First, a non-rebate mistaken refund is not the product of a faulty recalculation of the taxpayer's liability. Accordingly, the initial, pre-refund assessment will, as a general matter, be an accurate statement of the taxpayer's liability.[6] This is not necessarily true in the case of a rebate refund, which generally follows a faulty recalculation of liability.

Second, in the case of a non-rebate refund, the taxpayer has every reason to know that the refund was a mistake. As such, the taxpayer who receives a non-rebate refund is on notice from the moment she opens the refund envelope that the money she received does not belong to her. By contrast, because a rebate refund is based on a recalculation of liability that either was initiated or reviewed by the IRS, the taxpayer is less likely to be aware of the mistake, *i.e.*, that, in recalculating her liability, the IRS made a mistake in applying its own rules and regulations.

In this case, Mildred Cotler agreed to a settlement of a two-year-old dispute over her tax liability in May of 1984. In June 1984, she made a payment to cover the penalty portion of that settlement. Shortly thereafter, the IRS sent her checks totaling over $170,000, an amount which corresponded exactly to the amount she had pre-paid the IRS, plus interest. It is clear, and I find, that, upon the receipt of the IRS check, Cotler knew that the money did not belong to her. Even if she had not known of the error upon receipt of the check, six weeks thereafter the IRS sent Cotler a request for payment of $157,676.23. This request for payment constituted near-immediate notice from the IRS of what she already knew: that she had received the money wrongfully. Nevertheless, Mildred Cotler never raised the subject in the ensuing correspondence with the IRS—despite her efforts to prove to the IRS that she had satisfied a portion of the liability that did not involve the erroneous refund. About five months later, in April 1985, the IRS made explicit what had been obvious to Cotler since she received the first mistaken refund check in October 1984, when it sent

**6.** Indeed, in this case, the plaintiffs do not dispute that the initial assessment is accurate.

her a letter indicating that the money had been refunded to her erroneously.

### D. Congressional Intent and the Erroneous Refund Statute (26 U.S.C. § 7405)

To understand why the distinction between rebate and non-rebate refunds is so important, it is necessary to examine the purposes behind § 7405, the Tax Code's erroneous refund provision. That history plainly states that the statute provides for collection following "assessment in the ordinary manner." The plaintiffs do not dispute that the IRS can pursue collection on a proper assessment which post-dates the mistaken refund. It is true that the language in the legislative history appears to contemplate a new assessment which post-dates the erroneous refund, rather than the initial assessment. But a thorough review of the reasons justifying the need for a post-refund assessment leads me to a simple conclusion: in suggesting that post-refund assessment was necessary for collection of an erroneous refund, Congress had only rebate refunds in mind—not non-rebate refunds.

What is the purpose of an assessment? First and foremost, a tax assessment establishes a taxpayer's liability—it establishes if a taxpayer owes money to the IRS, and how much is owed. 26 U.S.C. § 6201. In cases where there has been an erroneous rebate refund, the taxpayer's "correct" liability is unknown. The IRS has sent the taxpayer a refund on the basis of a faulty recalculation of liability, but no accurate statement of liability exists. Accordingly, it makes sense that a new assessment is necessary to determine how much the taxpayer owes the IRS. In the case of a non-rebate refund, on the other hand, the taxpayer's liability has not changed from that reflected in the initial assessment. Indeed, the plaintiffs here do not challenge the accuracy of the September 1984 assessment.

Assessment also puts the taxpayer on notice that she owes the IRS money. Once the IRS determines that a taxpayer owes back taxes, it sends the taxpayer a Notice of Defi-

ciency before an assessment can be entered. 26 U.S.C. § 6212; *see also* 26 U.S.C. § 6213(a). In cases involving an erroneous rebate refund, this may be the first the taxpayer knows of her alleged liability. After all, the refund which created the liability arrived only after a recalculation of liability. In the case of a non-rebate refund, on the other hand, the taxpayer is generally aware of the liability.[7]

The Notice of Deficiency leading up to assessment also serves the purpose of initiating other procedural protections. For example, once a taxpayer has received a Notice of Deficiency, she has 90 days to file a petition in the Tax Court to challenge the deficiency. 26 U.S.C. § 6213(a). The IRS is barred from entering the assessment, levying against the taxpayer or seeking collection of the deficiency in court until the time for filing of a petition has passed. *Id.* If the taxpayer files a timely petition in Tax Court, the IRS is barred from pursuing collection until the decision of the Tax Court has become final. *Id.*

In short, the assessment process sets in motion a series of procedural protections that are essential to the fair administration of the Tax Code. In the case of a rebate refund, these procedures are imperative. The taxpayer may not be aware of the liability, and has had no opportunity to challenge the IRS's conclusion that she owes the government money.

By contrast, it does not make sense to require these protections for collection of a non-rebate refund. In the case of a non-rebate refund, the taxpayer already has received a Notice of Deficiency—the notice which preceded the initial assessment. In the normal case, as in this one, this notice of deficiency will have led to the opportunity to challenge the liability. Thus, the taxpayer already will have been given an opportunity to challenge the deficiency which led to the very assessment upon which the government seeks to collect. 26 U.S.C. § 6213(a). It makes little sense to require that process to

---

7. Here, the plaintiffs do not seriously contest that Mildred Cotler knew the approximately $172,000 she received was a mistake.

be repeated merely because the government sent the taxpayer a refund as a result of a clerical error.

Indeed, the facts of this case are even more compelling than the facts of the normal case. The assessment upon which the government seeks to collect was the product of a settlement agreement. The plaintiffs do not dispute the accuracy of the assessment. Moreover, in the settlement agreement, Mildred Cotler waived her right to the procedural protections afforded by § 6213(a). She thus waived her right to challenge the deficiency underlying the very assessment upon which the government now seeks to collect. It is irrational to suggest that because the "refund" Cotler received was sent by the IRS in error, that agency should now have to repeat the same assessment procedures it already has conducted, even though both parties agree that the underlying assessment is accurate. Nor would it make sense to require the IRS to provide Cotler with procedural protections to challenge the basis for the repeated assessment when she already has waived her right to such a challenge.

I hold that the clear import of § 7405 and its accompanying legislative history is this: Congress intended to permit the IRS to collect an erroneous refund on the basis of an assessment that (1) accurately reflects the taxpayer's liability, (2) is based on proper notice to the taxpayer, and (3) was entered on the taxpayer's account only after the taxpayer was given an opportunity to challenge the basis for the assessment as set forth in the Tax Code. Each of these conditions is satisfied in this case. Congress thus plainly intended that, in the case of a non-rebate refund, collection following "assessment in the ordinary manner" was meant to provide for collection based on the initial, pre-refund assessment.[8]

I recognize that a number of courts have reached a different conclusion in similar or related situations. Relying on a doctrine

known as "extinguishment," these courts have concluded that a payment of taxes "extinguishes" an underlying assessment, thus barring collection of taxes on the basis of that assessment. *See, e.g., Singleton v. United States,* 128 F.3d 833 (4th Cir.1997); *Bilzerian v. United States,* 86 F.3d 1067 (11th Cir.1996); *Clark v. United States,* 63 F.3d 83 (1st Cir.1995); *O'Bryant v. United States,* 49 F.3d 340 (7th Cir.1995); *United States v. Wilkes,* 946 F.2d 1143 (5th Cir.1991). I find these opinions to be unpersuasive.

The Fifth Circuit was the first of the circuits to adopt the extinguishment doctrine. The taxpayer in *Wilkes* had determined that it owed $16,025.41, and set about making quarterly payments to total that amount.[9] The IRS determined the liability was slightly higher—$16,243.58—and sent the taxpayer a notice of its calculation. Thereafter, the IRS inadvertently credited to the plaintiff's account a large payment made by a different taxpayer. Counting both the regular payments and the mistakenly credited payment, the IRS incorrectly concluded that the taxpayer had made a substantial overpayment, and sent the taxpayer a refund of $17,938.04 when, in fact, the taxpayer's payments—based on its own slightly low estimate—were less than it owed the government. *Wilkes,* 946 F.2d at 1144–45. When the IRS discovered its error, it sought to reduce the assessment of $16,243.58 to a judgment and to collect on that judgment. *Id.* at 1148. The Fifth Circuit held that the payments made by the taxpayer totaling what it initially determined it owed—$16,025.41—had extinguished the slightly higher assessment to the extent of the payment. Accordingly, the court entered judgment against the taxpayer for the difference between its payment and the IRS assessment—about $218—thus permitting the taxpayer to keep the erroneous refund. *Id.* at 1152.

---

8. The portion of § 7405 which provides for collection in court subject to the two-year statute of limitations of § 6532, as noted above, is not implicated here. My interpretation of § 7405 does not render the two-year provision superfluous. That provision would apply in the case of a rebate refund, or in the case where a non-rebate

refund was paid to a different taxpayer from the taxpayer initially assessed—so that there is no initial assessment which accurately reflects the taxpayer's liability.

9. The taxpayer was an estate.

*Wilkes* is distinguishable. Unlike this case, where the refund left the taxpayer in a situation where collection on the assessment would satisfy the taxpayer's liability, the assessment in *Wilkes* was no longer accurate, given the payments made against the account. Rather, the IRS's attempt to collect on the basis of the earlier liability seems to have been an attempt to collect on that liability twice: the agency already had received payment for all but about two hundred dollars of the assessment, so the second collection appears to have been no more than a backdoor attempt to recover as much of the erroneous refund as possible.[10]

The Fourth Circuit's recent decision in *Singleton* is also distinguishable. There, the taxpayers filed, along with a joint federal individual income tax return for 1987, a Form 3800 indicating a business credit carryforward of $92,429. *Singleton,* 128 F.3d at 834. Acting on the advice of their tax preparer, however, they reported that they were entitled to a credit of only $423. *Id.* Thereafter, the IRS sent the Singletons a Correction Notice stating that "an error [had been] made when [their] general business credit was figured on [their] form 3800." *Id.* The IRS calculated that the Singletons were entitled to a business credit carryforward of $92,429. *Id.* It therefore refunded to the Singletons $92,006. *Id.*

Nearly three years later, the IRS advised the Singletons that, "[a]s a result of recent changes in the tax laws, rulings, or regulations, [it had] changed [their] tax return for [1987]." *Id.* The letter stated that the Singletons now owed the amount they had calculated in their 1987 tax forms, plus interest. *Id.* In response, the Singletons paid the back taxes by entering into an installment agreement with the IRS. *Id.* They thereafter filed suit, seeking a refund. *Id.* at 834–35. In opposing the Singletons' entitlement to a refund, the government argued, *inter alia,* that the refund had been issued by mistake and,

accordingly, that it was a non-rebate refund. *Id.* at 835.

In concluding that, under those facts, the Singletons were entitled to a refund, the Fourth Circuit stated that, like its sister circuits, it "frown[ed] upon the government's attempt to bypass congressionally mandated procedures in the case of purported nonrebate refunds." *Id.* at 838. It went on to state, however, that, "[e]ven assuming, arguendo, that the distinction between rebate and non-rebate refunds is valid, ... this case involves a rebate refund" because "the changes in the Singletons' tax status were based not on computer or computational errors, as the government contends, but on substantive recalculations of their tax liability." *Id.*

Given the facts of *Singleton,* the Fourth Circuit's statement, in *dicta,* that it perceived the government's argument that the Singletons had been issued a non-rebate refund to be an attempt "to bypass congressionally mandated procedures in the case of purported nonrebate refunds" is understandable. In *Singleton,* the taxpayers required the assistance of a tax preparer to determine their liability. *Id.* at 834. Accordingly, they understandably believed the IRS when it later informed them that their calculations were erroneous. Indeed, in informing the Singletons that it was increasing their tax liability, the IRS itself stated that the increased liability was the result of a change in their tax status, a change which was brought about by "recent changes in the tax laws, rulings or regulations." *Id.* at 834. Given that statement, the government's later attempt to argue that the refund had been issued as a result of a computer error was less than credible. By contrast, there is no question in this case either that the refund the IRS sent to Mrs. Cotler was issued in error, or that Cotler knew of that error.

Unlike *Singleton,* the facts in *O'Bryant* are similar to the facts of this case. There, the IRS credited the taxpayers' account twice for

---

10. Even under these extraordinary facts, however, the extinguishment doctrine cannot support its own weight: perhaps recognizing that the full liability had never really been paid, the court was unwilling to hold that the payments entirely extinguished the assessment. Instead, it held that

the payments extinguished the assessment only to the extent of payment. Apparently, this would leave a partial assessment. However, there appears to be no provision in the Code or any other precedent for the concept of "partial" assessments.

a single payment. As a result, it appeared as if the taxpayer was entitled to a credit in precisely the amount paid. Less than four months later, the IRS refunded the full amount paid as an overpayment. *O'Bryant,* 49 F.3d at 341. In holding that the taxpayer was entitled to keep the refund, the Seventh Circuit reasoned that the taxpayer's initial payment of the liability, even though refunded in full, extinguished the underlying assessment. *Id.* at 346. The court reasoned that the payment made by the taxpayers and the refund sent by the IRS were "fundamental[ly] differen[t] in character."[11] Accordingly, when the payment was received and cashed by the IRS, payment was complete and the assessment was extinguished. *Id.* Thus, the Seventh Circuit held that the O'Bryants had "paid" their tax liability, even though the IRS returned to the O'Bryants a check in the same amount as the check the O'Bryants had sent to it only four months before.

In *O'Bryant,* the court achieved its result in part by overlooking the dramatic difference between rebate and non-rebate refunds. As the court said, it "fail[ed] to see why an assessment should be constant in the non[-]rebate context when it is variable in the refund context." *Id.* The court need only have turned to the purposes of the erroneous refund statute for an answer: Congress intended to permit collection on the basis of assessment only when the assessment meets certain criteria. These criteria are met by an initial, pre-refund assessment in the case of a non-rebate refund, but not in the case of rebate refund.

In reaching its holding in *Clark,* the First Circuit also relied primarily on the purported distinction between the payment monies and the refund monies, concluding that "there is a fundamental difference between money taxpayers possess as the result of an erroneous refund and the money they originally owed the IRS (their tax liability)." *Clark,* 63 F.3d at 87. This distinction is unsupportable in the context of a non-rebate refund, where the amount of the taxpayers' assessment is in fact *precisely* "their tax liability."[12]

The timing of payments, refunds and assessment in the case before me highlights the irrationality of the extinguishment doctrine. Here, the payments and refunds predated the posting of the assessment. It is unreasonable to argue that an assessment could be extinguished by a payment which is made and returned before the assessment itself is even posted.

I find the arguments advanced in support of the extinguishment doctrine to be unpersuasive. After giving full consideration to Congress's intent in permitting collection of mistaken refunds following assessment "in the ordinary manner," I am satisfied that Congress meant to permit collection on the basis of an initial assessment in cases of non-rebate refunds. No other conclusion comports with Congress's intent or with common sense. This conclusion is consistent with the courts which have held that "actual satisfaction" of a liability "is required to extinguish an assessment." *Sanfellipo v. United States,* No. C–89–3988, 1990 WL 193640, at *2 (N.D.Cal. Oct.29, 1990); *Davenport v. United States,* 136 B.R. 125 (W.D.Ky.1991) ("A non-rebate erroneous refund simply gives back to the taxpayer a part of the taxpayer's assessed tax and the assessed balance due may be collected by ordinary collection procedures."). Accordingly, I reject the argument that a payment of a tax liability which is refunded before the assessment is even posted extinguishes that assessment.

E. *Applying the Erroneous Refund Statute to the Plaintiffs' Claim*

As explained above, Congress intended to permit collection of erroneous refunds on the

---

11. In an unreported opinion in this district, Chief Judge Sifton concluded that a "refund is appropriately treated in a different fashion than a tax in a variety of legal contexts." *Schipper v. United States,* No. 94–CV–4049, 1996 WL 651082, at *4 (E.D.N.Y. Oct.31, 1996). In that case, however, Chief Judge Sifton was not addressing the propriety of collection of an erroneous non-rebate refund. In any event, his references to that situation were *dicta.*

12. The *Bilzerian* court offers little reasoning at all, explaining simply that the "majority of courts" have rejected the difference between rebate and non-rebate refunds, and concluding that "we join these circuits." *Bilzerian,* 86 F.3d at 1069.

basis of an assessment which is accurate, which is based on proper notice to the taxpayer, and which was entered only after the taxpayer was given a full and fair opportunity to challenge the basis of the assessment. Congress did not provide that payment of a liability, followed by a non-rebate refund, should somehow extinguish or otherwise expunge an assessment, forcing the IRS to repeat steps which resulted in an indisputably accurate assessment of the taxpayer's liability.

There is no dispute that the September 1984 assessment of Mildred Cotler's tax liability accurately reflects her liability, was based upon proper notice to Cotler, and was entered only after Cotler was afforded (and waived) the protections provided for in the Tax Code. Accordingly, I conclude that the IRS had a proper basis for collection of Cotler's liability on the basis of the September 1984 assessment. The plaintiffs are not entitled to return of the payment made by the Estate of Mildred Cotler in 1990.

### CONCLUSION

Congress, in adopting the erroneous refund statute, provided methods for collection of money the IRS mistakenly sends taxpayers. In cases involving non-rebate refunds, the statute authorizes collection based on the initial pre-refund assessment. The refunds sent to Mildred Cotler in 1984 were non-rebate refunds. The IRS therefore properly based its 1990 collection of the Cotlers' tax liability on the initial, pre-refund assessment. The plaintiffs are not entitled to return of the $229,314.57 they paid in 1991 in response to the IRS's collection efforts. The Clerk of the Court is respectfully directed to enter judgment for the defendant.

So Ordered.